1    WO

6                IN THE UNITED STATES DISTRICT COURT

7                    FOR THE DISTRICT OF ARIZONA

9    Sandra R. Savarise,                    No. CV-13-2324-PHX-BSB

10                        Plaintiff,         **ORDER**

11   v.

12   Carolyn W. Colvin,

13                        Defendant.

15          Plaintiff Sandra R. Savarise seeks judicial review of the final decision of the

16   Commissioner of Social Security (the Commissioner) denying her application for

17   disability insurance benefits under the Social Security Act (the Act).  The parties have

18   consented to proceed before a United States Magistrate Judge pursuant to 28

19   U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure

20   16.1.  For the following reasons, the Court affirms the Commissioner's decision.

**I.   Procedural Background**

22          On July, 23, 2010, Plaintiff applied for disability insurance benefits under Title II

23   of the Act, based on disability beginning November 9, 2007.  (Tr. 164-170.)[1]  After the

24   Social Security Administration (SSA) denied Plaintiff's initial application and her request

25   for reconsideration, she requested a hearing before an administrative law judge (ALJ).

26   After conducting a hearing, the ALJ issued a decision finding Plaintiff not disabled under

27   the Act.  (Tr. 24-33.)  This decision became the final decision of the Commissioner when

---

[1] Citations to "Tr." are to the certified administrative transcript.  (Doc. 11.)

the Social Security Administration Appeals Council denied Plaintiff's request for review. (Tr. 1-7); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals Council.)   Plaintiff now seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.   Medical Records and Opinion Evidence

The record before the Court establishes the following history of diagnosis and treatment related to Plaintiff's health.   The record also includes an opinion from a lay witness and opinions from State Agency Physicians who examined Plaintiff and reviewed the records related to Plaintiff's impairments, but who did not provide treatment.

### A.   Treatment Records

In January 2006, Vincent J. Russo, M.D., examined Plaintiff for chronic right shoulder symptoms that stemmed from a 2004 fall.   (Tr. 585.)   Dr. Russo noted that Plaintiff had a limited range of motion.   (Tr. 585.)   He manipulated Plaintiff's shoulder and diagnosed a possible frozen shoulder.   (Tr. 585-87.)   During an April 2006 appointment, Dr. Russo noted that Plaintiff had continuing chronic impingement symptoms in her right shoulder and weakness of the rotator cuff.   (Tr. 581.)   Dr. Russo performed a right shoulder arthroscopy with debridement of the subacromial space. (Tr. 581-83.)   In May 2006, Dr. Russo noted that Plaintiff's chronic symptoms, including pain and a restricted range of motion, continued despite surgery.   (Tr. 576.)   He performed another shoulder manipulation at that time.   (Tr. 578.)

In November 2006, Alan C. Roga, M.D., examined Plaintiff for low back pain. (Tr. 571.)   Plaintiff reported that she had fallen and "land[ed] on her buttocks" when she was lifting a heavy table.   (Tr. 571.)   Plaintiff reported pain into her low back and she had a contusion on her right knee.   Plaintiff denied "pain or difficulty with ambulation."   (*Id.*) An X-ray revealed a compression fracture of L1 of indeterminate age.   (Tr. 574.)

On December 6, 2006, Christopher Yeung, M.D., an orthopedic surgeon, evaluated Plaintiff for pain related to her November 2006 fall.   (Tr. 602.)   Plaintiff reported that she did not have any radicular symptoms and denied "numbness, tingling, or

weakness." (*Id.*)  Plaintiff reported increased pain with prolonged sitting, standing, and walking.  (*Id*.)  She also reported that lying down, ice, and medication alleviated her pain.  (*Id.*)  Dr. Yeung observed that Plaintiff appeared to be in moderate discomfort, had a very stiff range of motion, and some tightness with a seated straight leg raise on the right.  (Tr. 603.)   He diagnosed a compression fracture at L1 and low back pain.   (*Id.*)  Dr. Yeung ordered an MRI of Plaintiff's lumbar spine and sacrum and prescribed Flexeril.  (Tr. 604.)  On December 8, 2006, an MRI showed a recent compression fracture of L1 with mild loss of height and mild degenerative disk change and disk bulges at L4-5 and L5-S1.  (Tr. 607.)

On December 18, 2006, Dr. Yeung noted that Plaintiff had increased pain and pinpoint tenderness in her right lumbar spine.  (Tr. 601.)  Plaintiff again denied radicular symptoms.  (*Id.*)  Dr. Yeung opined that "an injection" would not help because Plaintiff's pain did not appear to emanate from her lumbar spine.  (*Id.*)  Dr. Yeung recommended "time and physical therapy."   (*Id.*)   He also gave Plaintiff a Lidoderm patch and prescribed Percocet.  (*Id.*)  In January 2007, Plaintiff returned to Dr. Yeung and reported increased pain on the left side of her back.  (Tr. 600.)  She again denied radiating pain.  (*Id.*)

In March 2007, Plaintiff continued to report "significant" left-side back pain.  (Tr. 599.)   Dr. Yeung noted that Plaintiff's employer had excused her from work for thirty days because her pain was interfering with her ability to do her job.   (*Id.*)  Dr. Yeung completed disability paperwork on her behalf.  (*Id.*)  Plaintiff denied radiating pain and stated that Percocet helped.  (Tr. 599.)  Dr. Yeung referred Plaintiff to Mark J. Rubin, M.D., for a possible "quadratus lumborum injection."  (*Id.*)

On March 19, 2007, Plaintiff sought treatment from Dr. Rubin at the Arizona Center for Pain for left side low back pain.  (Tr. 295-99.)  Plaintiff described her pain as constant, cramping, dull, aching, and throbbing.  (*Id.*)  Plaintiff reported that her pain limited her ability to work, perform household chores, participate in recreation, and sleep.  (Tr. 295-96.)  She also reported experiencing headaches, decreased appetite and energy

level, fatigue, and reduced lateral motion.  (*Id.*)  Plaintiff denied difficulty with balance, gait abnormalities, or muscle weakness.  (Tr. 296.)  Dr. Rubin diagnosed closed fracture of lumbar vertebra, unspecified myalgia/myositis, and degeneration of the lumbar or lumbosacral intervertebral spine.  (Tr. 298-99.)  Dr. Rubin administered a trigger-point injection in the left side of Plaintiff's lumbar spine for pain relief.  (Tr. 300.)

Plaintiff saw Dr. Rubin again on March 26, 2007.  (Tr. 293.)  She reported "some pain relief" from the injection and a slightly improved activity level.  (*Id.*)  Dr. Rubin noted that Plaintiff's range of motion had improved and that she had mildly reduced extension and flexion.  (Tr. 294.)  Dr. Rubin administered another trigger-point injection. (Tr. 292-93.)  On April 2, 2007, Dr. Rubin gave Plaintiff a note releasing her to regular work duties without restriction effective April 11, 2007.  (Tr. 289-90.)  He noted that Plaintiff had a normal range of motion, no tenderness, and normal stability.  (Tr. 290.)

On April 30, 2007, Plaintiff returned to Dr. Rubin complaining of left lumbar paravertebral and left gluteal region pain.  (Tr. 286-88.)  Dr. Rubin noted that Plaintiff's range of motion was reduced and that she had a hematoma formation on her left hip and thigh.  (*Id.*)  Dr. Rubin administered two trigger-point injections.  (Tr. 287.)  In August 2007, Dr. Rubin noted that Plaintiff continued to experience severe left lumbar paravertebral pain.  (Tr. 282-84.)  She was taking Tylenol and felt sedated and fatigued. (*Id.*)  Plaintiff had several more trigger-point injections in August, September, and November 2007.  (Tr. 276-77, 281.)

On February 5, 2008, Plaintiff began treatment with Jonathan Komar, M.D. (Tr. 609.)  A lumbar spine X-ray that was taken that day showed a moderate, probably old, compression fracture at L1.   (Tr. 657-59.)   The x-ray also showed "mild" osteoarthritis of the lumbar spine.  (*Id.*)  On February 8, 2008, an MRI of Plaintiff's lumbar spine showed a compression fracture at L1 and mild degenerative disc disesase. (Tr. 660-61.)  An x-ray of Plaintiff's left foot showed mild osteoarthritis, especially at the first metatarsophalangeal (MTP) joint.  (Tr. 657-59.) On February 15, 2008, Dr. Komar administered a steroid injection in the MTP joint on Plaintiff's left foot.   (Tr. 662.)

1    Dr. Komar diagnosed Plaintiff with first MTP joint degenerative joint disease in her left

2    foot.  (Tr. 662-63.)

3          On March 5, 2008, Dr. Komar administered an epidural injection at L5-S.

4    (Tr. 662-63.)  He diagnosed lumbar degenerative disk disease, lumbar spondylosis, and

5    low back pain.  (*Id.*)  On March 25, 2008, Plaintiff reported to Dr. Komar that the

6    epidural provided some immediate pain relief, but the pain — mainly in the left side of

7    her low back — gradually increased over the following days until it returned to its pre-

8    injection level.  (Tr. 610.)  Plaintiff reported that her back pain was worse when lying flat

9    on her back, standing, and walking.  (*Id.*)  Dr. Komar noted lumbosacral tenderness on

10   palpation, and that flexion and extension elicited lumbosacral pain.  (*Id.*)  Dr. Komar

11   noted no weakness in Plaintiff's lower extremities and that she had a normal stance and

12   gait.  (Tr. 611.)  He scheduled another epidural injection for Plaintiff's low back pain.

13   (*Id.*)

14         In May 2008, Dr. Komar noted that Plaintiff's back pain had not improved since

15   her third epidural injection, which was completed three weeks prior, and he noted that her

16   back pain was worse with sitting and standing.  (Tr. 614.)  Plaintiff's low back and

17   lumbosacral spine were tender on palpation.  (Tr. 614-15.)  Plaintiff had no weakness in

18   her lower extremities and had a normal gait.  (Tr. 615.)

19         In June 2008, Plaintiff had a left L3 medial branch nerve radiofrequency ablation

20   (RFA).  Two weeks later, Plaintiff reported that she was unsure if there was any

21   improvement in her pain.  (Tr. 618, 671.)  In September and October 2008, Dr. Komar

22   noted a positive Gillet test on the left side of Plaintiff's low back and a positive pelvic

23   rock test at the left sacroiliac joint.  (Tr. 626, 630.)  On October 22, 2008, Plaintiff had a

24   left sacroiliac joint injection.  (Tr. 674.)

25         On January 8, 2009, Plaintiff saw Dr. Turkeltaub for breast reduction surgery.

26   (Tr. 308.)  Dr. Turkeltaub noted that Plaintiff had severe back problems.  (*Id.*)  He noted

27   that Plaintiff had received multiple nerve blocks and epidural injections over the previous

28   two years.  (*Id.*)  Plaintiff had breast reduction surgery on February 2, 2009.  (Tr. 313.)

1   Dr. Turkeltaub advised Plaintiff to avoid heavy lifting and vigorous activity for
2   approximately three weeks after the procedure.  (Tr. 308.)

3   　　　Plaintiff returned to Dr. Komar on April 15, 2009.  (Tr. 340.)  She stated that she
4   was unable to perform the exercises that Dr. Komar had prescribed because
5   Dr. Turkeltaub had advised her to rest.  (*Id.*)  Plaintiff reported experiencing a lot of pain
6   at night, including "electrical" pain across her chest and breasts.  (*Id.*)

7   　　　Dr. Komar referred Plaintiff to Kerry Zang, M.D., and on July 7, 2009, Plaintiff
8   saw Dr. Zang for an evaluation of her first toe.  (Tr. 318-21.)  Dr. Zang recommended
9   surgery.  (*Id.*)  On October 2, 2009, Shahram Askari, D.P.M., performed an osteotomy
10  and bunionectomy with a toe joint replacement.  (Tr. 332-33.)  Plaintiff's foot was placed
11  in a boot and she was advised to stay off her feet as much as possible.  (*Id.*)  During a
12  November 2009 follow-up appointment, Plaintiff reported that her foot swelled and
13  became sore with movement.  (Tr. 330.)  Dr. Askari advised Plaintiff to continue range of
14  motion exercises and to avoid high impact activities.  (*Id.*)

15  　　　In March 2010, physician assistant Ashely Stowers (PA Stowers) at Dr. Komar's
16  office performed a diagnostic ultrasound of Plaintiff's left shoulder, which showed
17  moderate arthritic changes in the "AC joint" with joint effusion/impingement seen with
18  movement, a subacrominial bursa with mild inflammation, and an apparent moderate
19  partial tear at the distal insertion.  (Tr. 400.)  Plaintiff reported that her left shoulder pain
20  was exacerbated by lying on her left shoulder and was alleviated by avoiding using her
21  shoulder.  (Tr. 404.)  On March 19, 2010, PA Stowers administered an injection in
22  Plaintiff's left shoulder.  (Tr. 402.)  In April 2010, Plaintiff reported that her shoulder was
23  "much better" and that she was "very satisfied with the injection."  (Tr. 410.)  In May
24  2010, Plaintiff reported that her left arm was better, her shoulder pain did not wake her up
25  at night anymore, but she still had trouble raising her arm and putting on a bra.  (Tr. 411.)

26  　　　During a September 1, 2010 follow-up appointment with PA Stowers, Plaintiff
27  reported that her left shoulder was better but her back pain was worse.  (Tr. 423-28.)
28  She reported that the pain was mostly in her left low back and that her low back got tight

- 6 -

at night.  (*Id.*)  Plaintiff had a positive Gillet test on the left side and a positive pelvic rock test.  (*Id.*)  PA Stowers noted that Plaintiff would likely benefit from a psychological evaluation to help cope with the trauma of witnessing a murder.[2]  (*Id.*)

Plaintiff continued follow-up care with PA Stowers and Dr. Komar in October and December 2010.  (Tr. 470-72, 476-79, 484-86.)  Treatment notes reflect that Plaintiff continued to have positive empty can tests on the left side (related to her shoulder pain) and positive Gillet and pelvic rock tests related to her low back pain.  (*Id.*)  On December 13, 2010, Dr. Komar noted that Plaintiff continued to have left shoulder pain and scheduled a medial branch nerve block, which was performed two days later.  (Tr. 476, 482-83.)  On December 17, 2010, Plaintiff reported to PA Stowers that after the injection she rated her shoulder pain as a zero, but it gradually increased to seven out of ten less than six hours after injection.  (Tr. 484.)

On January 12, 2011, Dr. Komar performed an L3-L4 medial branch nerve and left L5 primary dorsal ramus RFA.  (Tr. 490.)  At a January 26, 2011 follow-up appointment, Plaintiff stated that the RFA improved her left shoulder pain by fifty percent.  (Tr. 503.)  She rated her pain as four out of ten and she reported fatigue.  (*Id.*)  In July 2011, Plaintiff reported to PA Stowers that she had no shoulder pain at the location of the RFA, but that she had pain above and below that area.  (Tr. 523.)  Plaintiff reported that her back pain was "pretty good" in the morning, but as the day progressed her back pain increased and was worse with sitting.  (*Id.*)  Plaintiff reported that her left foot pain increased depending on the walking surface and her right hand continued to be tight and had increased pain.  (*Id.*)  A straight leg raising was positive on the left side.  (*Id.*)

---

[2]  On August 9, 2010, Plaintiff saw Barbara Lipschitz, M.D., and reported that she was stressed after witnessing a drug-related murder in Mexico.  (Tr. 364.)

1

2

### B.      Medical and Lay Opinion Evidence

#### 1.      Neil McPhee, M.D.

On October 5, 2010, Dr. McPhee evaluated Plaintiff for her application for disability benefits.    (Tr. 443-45.)   As part of his evaluation, Dr. McPhee ordered a lumbar spine x-ray.  (Tr. 444.)  The x-ray reflected superior endplate compression at L1, age uncertain, and minor degenerative changes in the lower thoracic and lumbar spine. (Tr. 441.)   On examination, Dr. McPhee noted that Plaintiff could walk, she could tandem walk "slowly and carefully," she could not walk on her toes or the heels on her left side, and she squatted "minimally." (Tr. 444.)  He noted that Plaintiff was able to get onto the examination table, that her four extremities had a full range of motion, she had normal strength, and intact sensation.  (*Id.*)  Her deep tendon reflexes were normal and symmetric, and straight leg raise was negative for pain bilaterally.  (*Id.*)

Dr. McPhee opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently.  (Tr. 444.)  He also opined that Plaintiff could stand or walk six to eight hours in an eight-hour day, and sit six to eight hours, but that she would be do best if she could "alternate positions based on her comfort." (*Id.*)  Dr. McPhee further found that Plaintiff could frequently climb ramps and stairs, but could not climb ladders, ropes, or scaffolds.  (Tr. 444-45.)  He also found that Plaintiff could occasionally stoop, kneel, crouch, and crawl, and that she was not limited with upper extremities reaching, handling, fingering, or feeling.  (Tr. 445.)

#### 2.      Carol McLean, Ph.D.

On October 13, 2010, Dr. McLean evaluated Plaintiff for her application for disability benefits. (Tr. 447-50.)  Dr. McLean diagnosed Plaintiff with major depressive episode, generalized anxiety with panic attacks, and opined that her main work-related impairment appeared to be physical.  (*Id.*)  Dr. McLean opined that Plaintiff functioned well cognitively and emotionally and that she did not have any mental functional restrictions that would last twelve months or longer.  (Tr. 450-51.)

### 3.     PA Stowers

On January 10, 2011, PA Stowers completed a Physical Capacities Evaluation. (Tr. 458.) She opined that Plaintiff would need to change positions occasionally, and that she could sit for three hours at a time, stand for one hour at a time, and walk for thirty minutes at a time.  (Tr. 458.)  She also opined that during an eight-hour workday, Plaintiff could sit for a total of five hours, stand for a total of two hours, and walk for a total of one hour.  (*Id.*)  She opined that Plaintiff should not squat or crawl, could occasionally bend, climb, and reach, and had moderate limitations involving heights. (Tr. 459.) She also found that Plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty-five pounds.  (Tr. 458.)  She further found that Plaintiff had mild limitations with concentration and would miss about two days of work per month. (Tr. 459.)   The assessment covered the time period from February 2008 through December 17, 2010.  (*Id.*)

On August 23, 2011, PA Stowers completed another Physical Capacities Evaluation.  (Tr. 521-22.)   She opined that Plaintiff would need to change positions occasionally, that she could sit for three hours at a time, stand for forty-five minutes at a time, and walk for forty-five minutes at a time.  (Tr. 420.)  She also opined that during an eight-hour workday, Plaintiff could sit for a total of five hours, stand for a total of two hours, and walk for a total of one hour.  (*Id.*)  She opined that Plaintiff should not squat or crawl, could occasionally bend, climb, and reach, and had moderate limitations involving heights.  (Tr. 522.) She also found that Plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty-five pounds.  (Tr. 521.)  She further found that Plaintiff had mild limitations with concentration and would miss about two days of work per month. (Tr. 522.)  The assessment covered the time period from February 2008 through August 23, 2011.  (*Id.*)

On March 28, 2012, PA Stowers completed an Residual Functional Capacity (RFC) Questionnaire.  (Tr. 564.)  She opined that Plaintiff could sit for one hour at a time and for a total of three hours, stand for thirty minutes at a time and for a total of one hour,

and walk for thirty minutes at a time for a total of one hour.  (Tr. 564.)  She also opined that Plaintiff could frequently lift ten pounds and occasionally lift twenty pounds, could frequently reach, occasionally bend and squat, but could not climb or crawl.  (Tr. 564-65.)  She also found that Plaintiff's concentration was mildly limited and that she would miss one day of work per month.  (Tr. 565.)

### 4.      Nadine Keer, D.O.

On March 29, 2011, State Agency consulting physician Dr. Keer completed a RFC assessment.   (Tr. 99.)   She opined that Plaintiff could lift or carry twenty pounds occasionally and ten pounds frequently.  (*Id.*)  She also opined that Plaintiff could stand, walk, and sit about six hours in an eight-hour day.  (*Id.*)  She further found that Plaintiff could frequently climb ramps or stairs, occasionally stoop, kneel, and crouch, but should never climb ladders, ropes, or scaffolds.  (*Id.*)  Dr. Keer also found that Plaintiff was limited in reaching overhead on the left side.  (Tr. 100.)

### 5.      Dr. Komar

On April 10, 2012, Dr. Komar completed an RFC questionnaire.  (Tr. 566-68.)  He noted that he had seen Plaintiff nearly every other month since February 5, 2008.  (Tr. 566.)  He identified Plaintiff's symptoms as left low back pain, left thoracolumbar pain, and fatigue.  (*Id.*)  He diagnosed degenerative lumbar disc disease, lumbosacral degenerative joint disease, and a herniated lumbar disc.  (*Id.*)  Dr. Komar described Plaintiff's pain as constant with a severity ranging from five to seven out of ten.  (*Id.*)  He noted that Plaintiff's reduced range of motion, tenderness, muscle weakness, and emotional factors contributed to her limitations.  (*Id.*)

He opined that Plaintiff could work four to six hours per day for a total of twenty to twenty-five hours per week with the need to occasionally change position.  (*Id.*)  He opined that Plaintiff could sit for one hour at a time, stand for thirty minutes at a time, and walk for thirty minutes at a time.  (Tr. 567.)  He also opined that during an eight-hour workday, Plaintiff could sit for a total of three hours, stand for a total of one hour, and walk for a total of one hour.  (*Id.*)  He opined that Plaintiff should not crawl or climb,

1   could occasionally bend and squat, and could frequently reach.  (Tr. 568.)  He also found

2   that Plaintiff could frequently lift up to ten pounds and occasionally lift up to twenty

3   pounds.     (Tr. 567.)    He further found that Plaintiff had mild limitations with

4   concentration and would miss about one day of work per month.  (Tr. 568.)  Dr. Komar's

5   assessment covered the time period from 2010 to 2012.  (*Id.*)

6                    **6.      Lay Witness Statement — Thomas Savarise**

7          On September 5, 2012, Plaintiff's husband, Thomas Savarise, completed a Third

8   Party Function Report.  (Tr. 202-09.)  He reported that Plaintiff was a caretaker and legal

9   guardian for her mother who was in an assisted living center.  (Tr. 202.)  He reported that

10  Plaintiff performed her personal care very slowly and that she could not reach her arm

11  behind her to fasten clothing.  (Tr. 203.)  He stated that Plaintiff did limited cleaning,

12  laundry, and shopping for groceries or personal items, but that she had to take her time

13  doing anything physical depending on her level of pain.  (Tr. 204-05.)  He stated that

14  Plaintiff could no longer bike, power walk, or bowl for prolonged periods.  (Tr. 206-07.)

15  Mr. Savarise stated that Plaintiff paid bills, counted change, handled a savings account,

16  and used a checkbook.  (Tr. 205.)  Further, Mr. Savarise stated that Plaintiff was limited

17  to lifting small household items and had difficulty sitting, standing, and walking.

18  (Tr. 207.)

19  **III.    Administrative Hearing Testimony**

20         Plaintiff was represented by counsel and testified at the administrative hearing.

21  She was in her sixties at the time of the hearing, she had a high school education and had

22  completed several years of college, and had past relevant work as a card dealer, survey

23  worker, and retail manager.  (Tr. 65, 185.)  Plaintiff testified that she last worked as a

24  card dealer in November 9, 2007 because she could not stand for extended periods.

25  (Tr. 47.)

26         Plaintiff testified that she had constant back pain that was aggravated by sitting,

27  standing, and walking and that required her to lay down for approximately an hour and a

28  half to try and alleviate the pain.  (Tr. 46-47.)  Plaintiff testified that she could sit for

about an hour-and-a-half before she needed to stand up and stretch for approximately ten to fifteen minutes before sitting again.  (Tr. 48.)  She also testified that standing for fifteen minutes caused the same pressure in her back as sitting.  (Tr. 58.)  On a scale of zero to ten, Plaintiff rated her pain as a six or seven on a daily basis.  (Tr. 56.)  When it reached an eight, she took pain medication.  (*Id.*)  Plaintiff stated that Lyrica caused her ankles and hands to swell and Lidocaine patches gave her a rash and made her dizzy.  (Tr. 56-57.)  She testified that the medications she was taking at the time of the hearing caused some dizziness and fatigue that lasted a couple hours and caused her to lie down for a few hours every afternoon.  (Tr. 57.)  She stated that an "ice pack" made her pain better.  (Tr. 47.)

Plaintiff testified that she had breast reduction surgery in an attempt to relieve the pressure on her back.  (Tr. 59.)  She stated that she had ongoing issues as a result of the surgery, including scar tissue buildup under her right breast, which hurt when she tried to stand for extended periods.  (*Id.*)  Plaintiff rated this pain as a seven to eight out of ten.  (*Id.*)  Plaintiff stated that she would need additional surgery on her left big toe to replace the artificial joint which was wearing out.  (Tr. 62.)  She testified that the artificial joint made it hard for her to walk more than half a block.  (Tr. 62-63.)  She also stated that she had migraine headaches once or twice a month.  (Tr. 63.)

Plaintiff testified that she had difficulty reaching overhead.  (*Id.*)  She stated that she could pick up a gallon of milk (about eight pounds) in front of her, but could not lift it overhead.  (Tr. 61.)  Plaintiff testified that she also had four cysts in her right hand that were getting worse and Dr. Komar had told her he would refer her to a hand specialist once she was unable to open and close her fingers all the way.  (Tr. 50-51.)

Plaintiff testified that her pain limited her to driving a few miles at a time, such as trips to the grocery store.  (Tr. 46, 53.)  On a typical day, she read or watched television, but she could not always pay attention.  (Tr. 50.)  Plaintiff testified that she tried to go with her husband to the grocery store or lunch a few times a week on "ok" days, but stated that she had more bad days than good each month.  (Tr. 50, 60.)  She testified that

1    she could put a few things in the dishwasher, but her husband mainly took care of the

2    household chores.  (Tr. 60.)  Plaintiff and her husband went to Hawaii in March 2012,

3    however, the trip was difficult for her and her symptoms prevented her from participating

4    in recreational activities.  (Tr. 50, 60-61.)

5         Vocational expert Shirley Ripp also testified at the hearing.  (Tr. 63.)  She testified

6    that a hypothetical individual of Plaintiff's age, education, and work experience with the

7    limitations identified by Dr. Keer (Tr. 99-101) could not perform Plaintiff's past work as

8    a card dealer, but could perform her past work as a retail manager.[3]  (Tr. 65-66.)  The

9    vocational expert further testified that if the hypothetical individual also required the

10   option to sit or stand "at will," all of Plaintiff's past relevant work would be precluded.

11   (Tr. 67.)  When asked if such an individual could perform other work, the vocational

12   expert stated that such a person could perform work as a parking lot cashier, but then

13   acknowledged that because this position required the worker to reach for parking tickets,

14   the hypothetical individual likely could not perform that job.  (Tr. 67, 69-70.)

15        The vocational expert further testified that a hypothetical individual of Plaintiff's

16   age, education, and work experience with the limitations identified by PA Stowers

17   (Tr. 458-59) would be unable to perform Plaintiff's past work.  (Tr. 67-68.)  She also

18   testified that an individual with the limitations identified by Dr. Komar (Tr. 566-70)

19   would be unable to perform Plaintiff's past relevant work or any other work.  (Tr. 68.)

20   **IV.   The ALJ's Decision**

21        A claimant is considered disabled under the Social Security Act if she is unable

22   "to engage in any substantial gainful activity by reason of any medically determinable

23   physical or mental impairment which can be expected to result in death or which has

24   lasted or can be expected to last for a continuous period of not less than 12 months."  42

25   U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical standard for

26   supplemental security income disability insurance benefits).  To determine whether a

27   _____

28       [3] Dr. McPhee identified similar functional limitations, however, he also found that
     Plaintiff would do best if she could alternate positions.  (Tr. 441-45.)

claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

### A.    Five-Step Evaluation Process

In the first two steps, a claimant seeking disability benefits must initially demonstrate (1) that she is not presently engaged in a substantial gainful activity, and (2) that her disability is severe.  20 C.F.R. § 404.1520(a)-(c).  If a claimant meets steps one and two, there are two ways in which she may be found disabled at steps three through five.  At step three, she may prove that her impairment or combination of impairments meets or equals an impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R. Part 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If not, the ALJ determines the claimant's RFC.  At step four, the ALJ determines whether a claimant's RFC precludes her from performing her past work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant establishes this prima facie case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.

### B.    The ALJ's Application of the Five-Step Evaluation Process

Applying the five-step sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the relevant period.  (Tr. 25.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "headaches; status post L1 compression fracture, lumbar degenerative disc disease; and left shoulder disorder.  (20 C.F.R. § 44.1520(c))."  (*Id.*)  At the third step, the ALJ found that the severity of Plaintiff's impairments did not meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 26-27.)  The ALJ next concluded that Plaintiff retained the RFC to perform "light work . . . except [she was limited to] frequent climbing and balancing, occasional stooping, crouching, kneeling and

1  crawling, [and] occasional overhead reaching with the left upper extremity."[4]  (Tr. 27.)

2  The ALJ also found that Plaintiff could not climb ladders, ropes, or scaffolds, and that

3  she needed "to avoid even moderate exposure to dangerous machinery with moving

4  mechanical parts and unprotected heights."  (*Id.*)  At step four, the ALJ concluded that

5  Plaintiff could perform her past relevant work as a retail manager.  (Tr. 33.)  Having

6  found Plaintiff capable of performing her past relevant work, the ALJ did not reach step

7  five.  (*Id.*)  The ALJ concluded that Plaintiff had not been under a disability, as defined in

8  the Act, since November 9, 2007 through the date of the June 7, 2012 decision.  (*Id.*)

9  **V.    Standard of Review**

10      The district court has the "power to enter, upon the pleadings and transcript of

11  record, a judgment affirming, modifying, or reversing the decision of the Commissioner,

12  with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  The district

13  court reviews the Commissioner's final decision under the substantial evidence standard

14  and must affirm the Commissioner's decision if it is supported by substantial evidence

15  and it is free from legal error.  *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198

16  (9th Cir. 2008); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  Even if the ALJ

17  erred, however, "[a] decision of the ALJ will not be reversed for errors that are

18  harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

19      Substantial evidence means more than a scintilla, but less than a preponderance; it

20  is "such relevant evidence as a reasonable mind might accept as adequate to support a

21  conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see

22  also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).  In determining whether

23  substantial evidence supports a decision, the court considers the record as a whole and

24  "may not affirm simply by isolating a specific quantum of supporting evidence."  *Orn v.

25  Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

26

27

28      [4]  Light work involves lifting no more than twenty pounds occasionally and ten pounds frequently and, as with medium work, "standing or walking, off and on, for a total of 6 hours of an 8–hour workday." SSR 83–10.

1    The ALJ is responsible for resolving conflicts in testimony, determining

2 credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

3 Cir. 1995).  "When the evidence before the ALJ is subject to more than one rational

4 interpretation, [the court] must defer to the ALJ's conclusion."  *Batson v. Comm'r of Soc.*

5 *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041).

6 **VI.  Plaintiff's Claims**

7    Plaintiff asserts that the ALJ erred by discounting her symptom testimony and in

8 her assessment of the medical source and lay opinion evidence.  (Doc. 13.)  Plaintiff asks

9 the Court to remand this matter for a determination of disability benefits.  (*Id.* at 25.)  In

10 response, the Commissioner argues that the ALJ's decision is free from legal error and is

11 supported by substantial evidence in the record.  (Doc. 15.)  As set forth below, the Court

12 finds that the ALJ did not commit harmful error and affirms the disability determination.

13    **A.    Assessing a Claimant's Credibility**

14    Plaintiff asserts that the ALJ erred by discrediting her symptom testimony.

15 (Doc. 13 at 19-26.)  An ALJ engages in a two-step analysis to determine whether a

16 claimant's testimony regarding subjective pain or symptoms is credible.  *Garrison v.*

17 *Colvin*, 2014 WL 3397218, at *16 n.18 (9th Cir. Jul. 14, 2014) (citing *Lingenfelter v.*

18 *Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).

19    "First, the ALJ must determine whether the claimant has presented objective

20 medical evidence of an underlying impairment 'which could reasonably be expected to

21 produce the pain or other symptoms alleged.'"  *Lingenfelter*, 504 F.3d at 1036 (quoting

22 *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  The claimant is not

23 required to show objective medical evidence of the pain itself or of a causal relationship

24 between the impairment and the symptom.  *Smolen*, 80 F.3d at 1282.  Instead, the

25 claimant must only show that an objectively verifiable impairment "could reasonably be

26 expected" to produce his pain."  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d

27 at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d at 1160–61 (9th Cir. 2008)

28 ("requiring that the medical impairment 'could reasonably be expected to produce' pain

1   or another symptom . . . requires only that the causal relationship be a reasonable

2   inference, not a medically proven phenomenon").

3      Second, if a claimant shows that she suffers from an underlying medical

4   impairment that could reasonably be expected to produce her pain or other symptoms, the

5   ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how

6   the symptoms, including pain, limit the claimant's ability to work.  *See* 20

7   C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective

8   medical evidence, the claimant's daily activities, the location, duration, frequency, and

9   intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

10  medication taken, and treatments for relief of pain or other symptoms.  *See* 20

11  C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

12     At this second evaluative step, the ALJ may reject a claimant's testimony

13  regarding the severity of her symptoms only if the ALJ "makes a finding of malingering

14  based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

15  *Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

16  convincing reasons" for finding the claimant not credible.[5]  *Carmickle*, 533 F.3d at 1160

17  (quoting *Lingenfelter*, 504 F.3d at 1036).  "'The clear and convincing standard is the

18  most demanding required in Social Security Cases.'"  *Garrison*, 2014 WL 3397218, at

19  *15-18 (quoting *Moore v. Soc. Sec. Admin*., 278 F.3d 920, 924 (9th Cir. 2002)).  Because

20  there was no record evidence of malingering, the ALJ was required to provide clear and

21  convincing reasons for concluding that Plaintiff's subjective complaints were not wholly

22  credible.  Plaintiff argues that the ALJ failed to do so.

23     **B.**  **The ALJ's Reasons for Discounting Plaintiff's Subjective Complaints**

24       **1.**  **The Objective Medical Evidence**

25     The ALJ discounted Plaintiff's allegations about the severity of her symptoms and

26  limitations as unsupported by the objective medical record.  (Tr. 30-31.)   The record

27

28     [5]  The Ninth Circuit has rejected the Commissioner's argument (Doc. 15 at 9-10) that a lesser standard than "clear and convincing" should apply.  *Garrison*, 759 F.3d at 1015 n.18.

supports the ALJ's determination.  As the ALJ noted with respect to Plaintiff's back impairment, the objective tests did not support Plaintiff's allegations of disabling pain and limitations.  (Tr. 27, 29, 30.)  In 2006, an MRI of Plaintiff's lumbar spine revealed a compression fracture at L1, but only mild degenerative changes and disc bulges at two other levels with no disc herniation or significant narrowing.  (Tr. 607.)  An x-ray in October 2010 showed vertebral compression at L1 in Plaintiff's lower back and only "minor degenerative changes" in her lower thoracic and lumbar spine.  (Tr. 441.)  In addition, Plaintiff's straight leg raise tests were consistently negative, indicating no involvement of the spinal nerve root.  (Tr. 28-29, Tr. 298, 342, 348, 355, 376, 391, 397, 414, 426, 444, 600.)  Also, Plaintiff retained normal strength, sensation, and reflexes in her legs.  (Tr. 28-29, Tr. 298, 318-19, 343, 345-49, 352-56, 444.)  This evidence supports the ALJ conclusion that Plaintiff's back impairment was not as severe as she alleged and would not preclude all work activity.

However, the absence of fully corroborative medical evidence cannot form the *sole* basis for rejecting the credibility of a claimant's subjective complaints.  *See Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) (it is legal error for "an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings"), *superseded by statute on other grounds as stated in Bunnell v. Sullivan*, 912 F.2d 1149 (9th Cir. 1990); *see also Burch*, 400 F.3d at 681 (explaining that the "lack of medical evidence" can be "a factor" in rejecting credibility, but cannot "form the sole basis"); *Rollins v. Massanari*, 261 F.3d 853, 856-57 (9th Cir. 2001) (same).  Thus, absent some other stated legally sufficient reason for discrediting Plaintiff, the ALJ's credibility determination cannot stand.  As discussed below, the ALJ provided additional legally sufficient reasons for discounting Plaintiff's symptom testimony.

## 2. Plaintiff's Daily Activities

In discounting Plaintiff's credibility, the ALJ also noted that her daily activities were inconsistent with the alleged severity of her symptoms.  (Tr. 31.)  Plaintiff asserts that this was not a clear and convincing reason for discrediting her symptom testimony.

(Tr. 13 at 21.)   The Ninth Circuit repeatedly has "asserted that the mere fact that a plaintiff has carried on certain daily activities . . . does not in any way detract from her credibility as to her overall disability."  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (quoting *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)).  The Ninth Circuit has specified "two grounds for using daily activities to form the basis of an adverse credibility determination . . . ."  *Id.*  These include whether the claimant's daily activities "contradict [the claimant's] other testimony" and whether the claimant's "activities meet the threshold for transferable work skills. . . ."  *Id.* (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  Therefore, "[t]he ALJ "must make 'specific findings relating to [the daily] activities' and their transferability to conclude that a claimant's daily activities warrant an adverse credibility determination."  *Orn*, 495 F.3d at 639 (quoting *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005)).

Here, the ALJ considered Plaintiff's activities of daily living and concluded that "[t]he claimant's reports of her daily activities are inconsistent with an inability to perform any work."  (Tr. 31.)  The ALJ further stated that these activities "include taking care of her mother's bills and paperwork, using the dishwasher, doing laundry, dusting, grocery shopping, driv[ing] independently, watching television, and playing cards."  (Tr. 31-32.)  The ALJ did not make any specific finding that Plaintiff's daily activities were transferable to a work setting, and did not identify any other part of Plaintiff's testimony that was contradicted by her activities of daily living.  (Tr. 31.)  Therefore, the ALJ improperly relied on Plaintiff's daily activities to reject Plaintiff's symptom testimony.  *See Orn*, 495 F.3d at 639.

### 3.     Conservative and Routine Treatment

The ALJ also discounted Plaintiff's symptom testimony because "all treatment" was "conservative and routine."  (Tr. 31.)  Plaintiff argues that this is not a clear and convincing reason to discount her credibility because the record does not support the ALJ's characterization of her treatment.  (Doc. 13 at 22.)  The Commissioner does not respond to this argument.  (Doc. 15 at 9-12.)

A conservative course of treatment may discredit a claimant's allegations of disabling symptoms. *See Tommasetti v. Astrue,* 533 F.3d 1035, 1040 (9th Cir. 2008) (an ALJ may infer that a claimant's "response to conservative treatment undermines [his] reports regarding the disabling nature of his pain"); *Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007), (treatment of ailments with over-the-counter pain medication is "conservative treatment" sufficient to discount testimony); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (failure to request "any serious medical treatment for [claimant's] supposedly excruciating pain" was adequate reason to reject claimant's pain testimony); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative treatment can suggest a lower level of both pain and functional limitation, justifying adverse credibility determination).

Here, Plaintiff's treating doctors administered injections for her pain, including trigger-point injections, nerve blocks, and epidurals.  (Tr. 276-77, 281, 287, 292-93, 300, 313, 476, 482-82, 662-63.)  She also had RFA procedures and breast reduction surgery to address her back pain.  (503, 618, 671, 308.)  These treatments are not conservative. *See Lapeirre–Gutt v. Astrue*, 382 Fed. App'x 662, 664 (9th Cir. 2010) (treatment with narcotic pain medication, occipital nerve blocks, trigger-point injections, and cervical fusion surgery were not conservative); *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (describing conservative treatment as, for example, a physician's "failure to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain."); *Kephart v. Colvin*, 2014 WL 2557676, at *5 (C.D. Cal. Jun. 6, 2014) (concluding that Toradal injections and medial branch block treatment for the plaintiff's back pain were not conservative); *Christie v. Astrue*, 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011) (refusing to categorize trigger-point injections, epidural shots, and narcotic pain medication as conservative).  Accordingly, it was improper for the ALJ to discount Plaintiff's testimony regarding her pain and symptoms because she received what the ALJ characterized as conservative treatment.

### 4.      The Effectiveness of Treatment

The ALJ discounted Plaintiff's testimony about her symptoms related to her left shoulder impairment because that impairment had been effectively treated.   (Tr. 31.) Plaintiff does not challenge this part of the ALJ's decision.  (Doc. 13 at 19-23.)   The record reflects that after Plaintiff injured her shoulder in January 2010, she received an injection in March 2010.  (Tr. 411.)  During the months following the injection, Plaintiff repeatedly stated that her shoulder pain was better and she did not complain of any limitations caused by her shoulder.  (Tr. 29, 411, 417, 423, 529.)

In assessing a claimant's credibility about her symptoms, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication," and treatment other than medication, that the claimant has received for relief of pain or other symptoms.  20 C.F.R. § 404.1529(c)(3)(iv) and (v).  Evidence that treatment can effectively control a claimant's symptoms may be a clear and convincing reason to find a claimant less credible.  *See Warre v. Comm'r, of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (stating that "[i]mpairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.")  Because substantial evidence in the record reflects that Plaintiff's shoulder impairment was effectively controlled with treatment, the ALJ did not err in rejecting Plaintiff's related symptom testimony on that basis.

### 5.      Inconsistencies between the Record and Plaintiff's Testimony

The ALJ also explained that she discounted Plaintiff's testimony of disabling pain and fatigue, including the need to lay down for one to one-and-one-half hours per day as inconsistent with the medical record.  (Tr. 31.)  Plaintiff does not specifically challenge this reason for the ALJ's credibility determination.  (Doc. 13 at 19-23.)   The medical record includes a few notations that Plaintiff's pain "improved with lying down," (Tr. 618, 620) or that she felt fatigued (Tr. 503), but otherwise, does not refer to Plaintiff's need to lie down or rest.   (*See* Tr. 610-656.)   Additionally, the treatment records frequently describe Plaintiff as "alert," (Tr. 376, 381, 386, 391, 396, 406, 413,

419, 425, 614, 616, 618, 620, 623, 628, 632, 637, 643, 648, 654), state that she did not "feel[] tired (fatigue)" (Tr. 375, 380, 385, 390, 395, 405, 412, 418, 424, 627, 631, 636, 642, 647, 653), or do not mention fatigue or lying down.  (Tr. 610-11, 614-15, 616-17, 619, 621-22, 623-24, 626-29, 630-33, 635-39, 641-45, 646-50, 652-56.)  Thus, the ALJ properly discounted Plaintiff's testimony regarding fatigue and the need to lay down as inconsistent with the medical record.  *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence"); Social Security Ruling 96-7p, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record).

### 6.    The ALJ's Observations of Plaintiff

The ALJ also noted that Plaintiff "participate[d] closely and fully at the [administrative] hearing without distraction or any overt pain behavior."  (Tr. 31.) Plaintiff argues that it was improper for the ALJ to consider her observations of Plaintiff when assessing her credibility.  (Doc. 13 at 22.)  However, both the regulations and the Ninth Circuit recognize that an ALJ may consider "her own recorded observations of the individual [at the administrative hearing] as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p, 1996 WL 374186, at *5; *Orn,* 495 F.3d at 639 (while ALJ's observations of claimant's functioning may not form the sole basis for discrediting claimant's testimony, they may be used in the "overall evaluation of the credibility of the individual's statements"); *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) ("Although this Court has disapproved of so-called 'sit and squirm' jurisprudence, the inclusion of the ALJ's personal observations does not render the decision improper.").  Because the ALJ's observations of Plaintiff did not form the sole basis for discrediting her testimony, the ALJ did not err by including her observations in the credibility analysis.  *See Verduzco*, 188 F.3d at 1090.

Although the Court does not accept all of the reasons the ALJ stated in support of her adverse credibility determination, the ALJ provided legally sufficient reasons that are

1   supported by substantial evidence to support her credibility determination and, therefore,

2   the Court affirms it.  *See Batson*, 359 F.3d at 1197 (stating that the court may affirm an

3   ALJ's overall credibility conclusion even when not all of the ALJ's reasons are upheld);

4   *Tonapetyan*, 242 F.3d at 1148 (stating that "[e]ven if we discount some of the ALJ's

5   observations of [the claimant's] inconsistent statements and behavior . . . we are still left

6   with substantial evidence to support the ALJ's credibility determination.").

7       **C.    The ALJ's Assessment of the Lay Witness Statement**

8           Plaintiff also contends that the ALJ erred by failing to explain her conclusion that

9   the statements of Plaintiff's husband, Mr. Savarise, were "not persuasive of additional

10  restrictions in the claimant's residual functional capacity."    (Doc. 13 at 23-25.)

11  Mr. Savarise completed a third-party function report regarding Plaintiff's limitations and

12  activities.  (Tr. 203.)  He stated that Plaintiff was the caretaker and legal guardian for her

13  mother and that she ran errands for her mother with his help.  (*Id.*)  Mr. Savarise also

14  stated that Plaintiff cared for her own personal needs at a slow pace, prepared her own

15  meals, performed light chores, went shopping, often went outdoors, drove and rode in a

16  car, paid bills, read, and watched television.  (Tr. 203-06.)  He stated that Plaintiff could

17  only lift small household items and that pain affected her ability to lift, squat, bend, stand,

18  reach, walk, sit, kneel, and climb stairs.  (Tr. 207.)  These statements largely echoed the

19  limitations to which Plaintiff testified.  (*Compare* Tr. 46-60 *with* Tr. 203-07.)

20          As stated in 20 C.F.R. §§ 404.1513(d) and 416.913(d), an ALJ may, "in addition

21  to evidence from the acceptable medical sources . . . also use evidence from other sources

22  to show the severity of [a claimant's] impairment(s) and how it affects his ability to

23  work."   20 C.F.R. §§ 404.1513(d), 416.913(d).   Such other sources include spouses,

24  parents and other care givers, siblings, other relatives, friends, neighbors, and clergy.  20

25  C.F.R. §§ 404.1513(d)(4), 416.913(d)(4).    Thus, lay witness testimony by family

26  members who have the opportunity to observe a claimant on a daily basis "constitutes

27  qualified evidence" that the ALJ must consider.  *Sprague v. Bowen*, 812 F.2d 1226, 1231-

28  32 (9th Cir. 1987); *see Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993) ("[a]n

eyewitness can often tell whether someone is suffering or merely malingering . . . .   [T]his is particularly true of witnesses who view the claimant on a daily basis . . . .").   To reject lay testimony, an ALJ must give reasons "germane to each witness" for doing so.   *Dodrill*, 12 F.3d at 919.

Here, the ALJ considered Mr. Savarise's statements, but found that they were not persuasive of additional restrictions in Plaintiff's RFC assessment.   (Tr. 32.)   The ALJ specifically noted that Mr. Savarise's statement that Plaintiff's application for disability benefits "deserve[d] . . . approval" was an opinion on an issue reserved to the Commissioner.   (Tr. 32.)   *See McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) ("A disability is an administrative determination . . . . The law reserves the disability determination to the Commissioner.").   In addition, the limitations and symptoms described in the third-party statement are similar to those which Plaintiff described.   (Tr. 46-50, 221-29.) Because the Court concludes that the ALJ did not err in discrediting Plaintiff's symptom testimony, and the third-party statements were consistent with Plaintiff's testimony, it was reasonable for the ALJ to discredit those statements as well.   *See Molina v Astrue*, 674 F.3d 1104, 1122 (9th Cir. 2012) ("Although the ALJ erred in failing to give germane reasons for rejecting the lay witness testimony, such error was harmless given that the lay testimony described the same limitations as Molina's own testimony, and the ALJ's reasons for rejecting Molina's testimony apply with equal force to the lay testimony.").

### D.   Medical Source Opinion Evidence

Plaintiff also argues that the ALJ erred in her assessment of the medical source opinion evidence.   In weighing medical source evidence, the Ninth Circuit distinguishes between three types of physicians: (1) treating physicians, who treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.   *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   Generally, more weight is given to a treating physician's opinion.   *Id.*   The ALJ must provide clear and convincing reasons supported by

1    substantial evidence for rejecting a treating or an examining physician's uncontradicted

2    opinion.  *Id.*; *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject

3    the controverted opinion of a treating or an examining physician by providing specific

4    and legitimate reasons that are supported by substantial evidence in the record.  *Bayliss v.*

5    *Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.  The Court

6    considers Plaintiff's claims regarding the weight the ALJ assigned to the medical source

7    opinions in light of these standards.

8                    **1.     PA Stower's Opinions**

9                    **a.     PA Stowers was an "Other" Medical Source**

10       To support her assessment of PA Stowers's opinion, the ALJ noted that PA

11   Stowers was not an acceptable medical source.  (Tr. 32.)  Plaintiff contends that the ALJ

12   erred by considering PA Stowers an "other source," or a non-acceptable medical source,

13   and argues that she should have been considered an acceptable medical source.[6] (Doc. 19

14   at 8.)  To support her argument, Plaintiff cites *Taylor v. Comm'r of Soc. Sec. Admin.*, 659

15   F.3d 1228 (9th Cir. 2011), which relies on *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir.

16   1996).  In *Gomez*, the Ninth Circuit found, based on a regulation that was later repealed,

17   (20 C.F.R. § 416.913(a)(6)), that a nurse practitioner's opinion was properly considered

18   as an opinion of an acceptable medical source when chart notes indicated that the nurse

19   practitioner regularly consulted with the treating physician, was closely supervised by the

20   treating physician, and acted as an agent of treating physician.  *Gomez*, 74 F.3d at 970-71.

21       To support her argument that PA Stowers should have been considered an

22   acceptable medical source, Plaintiff asserts that PA Stowers and Dr. Komar treated

23   Plaintiff at the same facility and that PA Stowers worked under the "direction and

24   ───────────────
              [6]   Only licensed physicians and certain other qualified specialists are considered
25   "[a]cceptable medical sources." 20 C.F.R. § 404.1513(a). These are limited to licensed
     or certified psychologists, licensed optometrists licensed podiatrists, and qualified
26   speech-language pathologists. 20 C.F.R. § 404.1513(a).  Physician assistants and nurse
     practitioners are defined as "other sources" § 404.1513(d), and their opinions are not
27   entitled to the same deference, *see* § 404.1527; SSR 06–03p, 2006 WL 2329939.

28

supervision" of Dr. Komar.  (Doc. 13 at 18.)  Although the record reflects that Dr. Komar and PA Stowers both worked at Southwest Spine and Sports (Tr. 373-439, Tr. 519-43), Plaintiff does not cite any evidence to support her statement that PA Stowers worked under Dr. Komar's direction and supervision.

Furthermore, the Ninth Circuit has stated that *Gomez* may have been superseded by regulation.  *Molina*, 674 F.3d at 1111 (declining to address *Gomez's* "continued vitality" because it did not directly apply to the case).  However, even if *Gomez* remains good law, the exception stated in that case does not apply here because there is no evidence that PA Stowers regularly consulted with, was closely supervised by, or was an agent of Dr. Komar.  *See Taylor,* 659 F.3d at 1234 (stating that to the extent that the nurse practitioner was working closely with, and under the supervision of, the treating physician her opinion should be considered that of an "acceptable medical source"); *Buck v. Astrue*, 2010 WL 2650038, *15 (D. Ariz. Jul. 1, 2010) (noting that in the case of an agency relationship with an "acceptable medical source," evidence from an "other source" may be ascribed to the supervising "acceptable medical source"); *Ramirez v. Astrue*, 2011 WL 1155682, at *4 (C.D. Cal. Mar. 29, 2011) (finding that physician's co-signature on patient plan prepared by a social worker did not indicate that the physician closely supervised the social worker's treatment of the claimant or preparation of the reports, thus the social worker's evaluation could not be attributed to an "acceptable medical source"); *Vasquez v. Astrue*, 2009 WL 939339, at *6 n.3 (E.D. Wash. Apr. 3, 2009) (finding that physician assistant's report "signed off" by a superior did not constitute an "acceptable medical source" opinion).  Accordingly, the ALJ did not err by considering PA Stowers an "other" medical source, as opposed to an acceptable medical source.

### b.      The ALJ's Consideration of PA Stowers's Opinion

The ALJ properly considered PA Stowers an "other" medical source.  Therefore, pursuant to SSR 06-03p, 2006 WL 2329939, the ALJ was required to consider her opinion and to give germane reasons for discounting it.  *See Valentine v. Comm'r Soc.*

*Sec. Admin.*, 574 F.3d 685, 694 (9th Cir. 1993) (quoting *Dodrill*, 12 F.3d at 919 (stating that when an ALJ rejects evidence from "other medical sources," the ALJ "must give reasons that are germane to each witness.")).

Here, the ALJ considered PA Stowers's opinions and explained that she accorded her opinions "no weight" because they were "conclusory with little explanation." (Tr. 32.)  For instance, PA Stowers did not explain why Plaintiff could only sit for three hours in an eight-hour workday or why she would need to miss two days of work per month.  (Tr. 32; *see* Tr. 522, 563).  The ALJ also noted that PA Stowers's opinions were inconsistent.  (Tr. 32.)  In 2011, PA Stowers stated that Plaintiff could sit for five hours per day, but less than a year later PA Stowers found that Plaintiff could only sit for three hours per day.  (Tr. 32; *compare* Tr. 521 *with* Tr. 564.)  In addition, in her 2012 opinion, PA Stowers indicated that Plaintiff's prognosis was "stable to good" but she still assessed Plaintiff with extreme functional limitations.  (Tr. 563.)

The ALJ's finding that PA Stowers's opinions were conclusory and inconsistent were germane reasons for assigning those opinions no weight.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) ("[i]nconsistency with medical evidence" is a germane reason for discrediting lay testimony); *Molina*, 674 F.3d at 1111-12 (the ALJ gave germane reasons for discounting a physician's assistant's opinion when the ALJ cited the check-box style of the opinion, which was conclusory and inconsistent with an earlier opinion, and was inconsistent with a physician's opinion).

The ALJ also found that the limitations that PA Stowers identified were not supported by her treatment notes.  (Tr. 32.)  Although PA Stowers's notes showed some tenderness on palpation of Plaintiff's back and a reduced range of motion, they also documented Plaintiff's normal neurological findings, including negative straight leg raising, no muscle atrophy, and no loss of sensation or reflexes.  (Tr. 32, Tr. 347-48, 376-77, 382, 391-92, 397, 414, 420, 426, 465, 473, 487.)   The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities.  *See Andrews*, 53 F.3d at 1039.  Therefore, although PA Stowers's treatment notes contain

1    evidence of some limitations, the ALJ's conclusion that PA Stowers's treatment records

2    did not support the limitations she identified was rational, and the Court "must uphold the

3    ALJ's decision where the evidence is susceptible to more than one rational

4    interpretation." *Magallanes*, 881 F.2d at 750; *see Batson*, 359 F.3d at 1198.  In summary,

5    the ALJ articulated several germane reasons for discrediting PA Stowers's opinions, and

6    those reasons are supported by substantial evidence in the record.

7                         **2.     Dr. Komar's Opinion**

8           Dr. Komar opined that, in an eight-hour day, Plaintiff could sit for one hour at a

9    time for a total of three hours, stand for thirty minutes at a time for a total of one hour per

10   day, and walk for thirty minutes at a time for a total of one hour per day.  (Tr. 567.)  He

11   also opined that Plaintiff could frequently lift up to ten pounds, occasionally lift up to

12   twenty pounds, and never lift more than twenty pounds.  (*Id.*)  He also found that she

13   could frequently reach, occasionally bend and squat, and never climb or crawl.  (Tr. 568.)

14          The ALJ gave Dr. Komar's opinions "[n]o weight" because the level of

15   impairment that Dr. Komar found was not supported by his treatment notes and appeared

16   to be based on Plaintiff's subjective complaints.  (Tr. 32.)  The ALJ did not err by

17   rejecting Dr. Komar's opinions as unsupported by the medical record, including his

18   treatment records because "the ALJ need not accept the opinion of any physician,

19   including a treating physician, if that opinion is brief, conclusory, and inadequately

20   supported by clinical findings."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219,

21   1138 (9th Cir. 2009); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195

22   (9th Cir. 2004) (an ALJ may discount treating physician opinions that are conclusory,

23   brief, and unsupported by the record as a whole, or by objective medical findings).

24   Although Dr. Komar's treatment notes and the medical record indicated some tenderness

25   on palpation of Plaintiff's back and a reduced range of motion, they also documented

26   Plaintiff's normal neurological findings, including negative straight leg raising, no

27   muscle atrophy, and no loss of sensation or reflexes.  (*See* Tr. 347-48, 376-77, 382, 391-

28   92, 397, 414, 420, 426, 465, 473, 487, 526, 532, 538, 548.)  Thus, while the medical

1   record contains some evidence of Plaintiff's limitations, the ALJ rationally concluded

2   that Dr. Komar's treatment records and the medical record did not support the limitations

3   he identified, and the Court "must uphold the ALJ's decision where the evidence is

4   susceptible to more than one rational interpretation."  *Magallanes*, 881 F.2d at 750; *see*

5   *Batson*, 359 F.3d at 1198.

6          The ALJ also noted that Dr. Komar's opinion appeared to be "based primarily on

7   [Plaintiff's] subjective statements . . . ."  (Tr. 32.)  An ALJ may give little weight to a

8   treating physician's opinion when the opinion is based on a claimant's subjective

9   complaints.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Batson*, 359

10  F.3d at 1195.   Moreover, the Court has already concluded that the ALJ properly

11  discredited Plaintiff's symptom testimony.  (Section VI.B.)

12          **E.     The ALJ's Assessment of the State Agency Physicians' Opinions**

13          Plaintiff further argues that the ALJ erred by relying on the opinions of examining

14  and consulting physicians Dr. McPhee, Dr. McLean, and Dr. Keer, to support her

15  disability determination.  (Doc. 13 at 18-19.)  The Ninth Circuit has held that the opinion

16  of an examining or reviewing physician may constitute substantial evidence in support of

17  an ALJ's decision when it is consistent with independent clinical findings or other

18  evidence of record.  *See Thomas*, 278 F.3d at 957.

19          **1.     Dr. McPhee**

20          Based upon his examination of Plaintiff, Dr. McPhee opined that Plaintiff had

21  abilities consistent with light work, including the ability to lift twenty pounds

22  occasionally and ten pounds frequently, stand or walk for about six hours in an eight-hour

23  workday, and sit for about six hours in an eight-hour workday.  (Tr. 444-45.)  He also

24  opined that Plaintiff would "be best in a situation where she [could] alternate positions

25  based on her comfort."  (Tr. 444.)  The ALJ assigned "greater weight" to Dr. McPhee's

26  opinion, however, she rejected the "sit/stand option" as not supported by the medical

27  record.  (Tr. 33.)

28

In her opening brief, Plaintiff asserts that the ALJ erred by relying on Dr. McPhee's opinion to support her disability determination because Dr. McPhee did not "offer[] diagnoses that differed from Dr. Komar and/or Stowers and his exam was not the result of reviewing medical testing that revealed that Dr. Komar and/or Stowers were inaccurate in their diagnoses or which they hadn't considered." (Doc. 13 at 18.)  Later, in the conclusion section of her opening brief, Plaintiff states that the ALJ erred by failing to set forth an appropriate basis for *rejecting* Dr. McPhee's opinion regarding Plaintiff's functional restrictions, but she does not explain that argument.  (Doc. 13 at 25.)  Thus, Plaintiff's opening brief does not clearly state the nature of her argument regarding Dr. McPhee's opinion.  In her reply brief, Plaintiff appears to argue that the ALJ erred by failing to provide a "clear reason[]" to reject Dr. McPhee's opinion that Plaintiff would do best if she could alternate positions.  (Doc. 16 at 7.)

Plaintiff did not raise this argument in her opening brief.  (Doc. 13.)  The district court reviews only those issues raised by the party challenging the ALJ's decision, *see Lewis v. Apfel*, 236 F.3d 503, 517 n. 13 (9th Cir. 2001), and does not review issues raised only in a reply brief.  *See Martin v. Astrue*, 2012 WL 527483, at * n.1 (D. Ariz. Feb. 17, 2012) (declining to consider the plaintiff's challenge to the RFC assessment that was raised for the first time in the reply brief).  Accordingly, the Court does not need to reach Plaintiff's argument asserted for the first time in her reply brief.

Moreover, the ALJ properly rejected Dr. McPhee's opinion that Plaintiff would do best if she could alternate positions as unsupported by the medical record.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (finding the incongruity between doctor's questionnaire responses and her medical records provided a specific and legitimate reason for rejecting the opinion); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (holding "that the ALJ properly found that [the physician's] extensive conclusions regarding [the claimant's] limitations are not supported by his own treatment notes.  Nowhere do his notes indicate reasons why [the physician would limit the claimant to a particular level of exertion]."); *Fuge v. Astrue*, 2013 WL 7672, at *6 (D. Or.

1  Jan. 4, 2013) (the ALJ did not err when he gave little weight to portions of a treating

2  doctor's opinion); (Tr. 347-48, 376-77, 382, 391-92, 397, 414, 420, 426, 465, 473, 487,

3  526, 532, 538, 548).

4       Additionally, the ALJ did not err in assigning "greater weight" to the rest of

5  Dr. McPhee's opinion regarding Plaintiff's functional abilities as consistent with the

6  medical evidence.  (Tr. 33.)  Dr. McPhee's opinion was consistent with Dr. Keer, a State

7  Agency reviewing physician, who opined that Plaintiff was limited to lifting twenty

8  pounds occasionally, and ten pounds frequently, standing or walking for six hours, and

9  sitting for six hours.  (Tr. 99-101.)  Dr. Keer's and Dr. McPhee's conclusions were

10  supported by the medical record, which indicates that Plaintiff had minor degenerative

11  changes in her spine, her straight leg raise tests were generally negative, she had normal

12  strength, sensation, and reflexes in her legs, and her shoulder pain was managed with

13  medication and injections.  (Tr. 298, 318-19, 343, 345-49, 352-56, 376, 391, 397, 414,

14  426, 444, 600.)

15  **2.    Dr. McLean**

16       After a psychological evaluation, Dr. McLean found that Plaintiff was

17  "functioning well cognitively and emotionally" and she opined that Plaintiff had no

18  mental limitations that would last for twelve months.  (Tr. 449-50.)  As the ALJ noted,

19  Plaintiff did not require psychiatric hospitalization, which was consistent with

20  Dr. McLean's opinion about Plaintiff's mental functional abilities.  (Tr. 31, Tr. 449-50.)

21       In summary, the ALJ did not err in assigning "greater weight" to most of

22  Dr. McPhee's opinion and to the opinions of Dr. McLean and Dr. Keer, which provided

23  substantial evidence in support of the ALJ's RFC assessment and disability

24  determination.  (Tr. 33); *see* 20 C.F.R. § 404.1527(f)(2)(i) ("State agency medical and

25  psychological consultants . . . are highly qualified physicians, psychologists, and other

26  medical specialists who are also experts in Social Security disability evaluation.");

27  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (examining physician's report

28  was "substantial evidence supporting the ALJ's findings").

**VII.    Conclusion**

As set forth above, the ALJ's opinion is supported by substantial evidence in the record and is free of harmful legal error.

Accordingly,

**IT IS ORDERED** that the Commissioner's disability determination is **AFFIRMED**.   The Clerk of Court is directed to enter judgment in favor of the Commissioner and against Plaintiff and to terminate this action.

Dated this 13th day of November, 2014.

Bridget S. Bade
United States Magistrate Judge